**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

CINDY L. MARFIELD,
      **Plaintiff,**

v.
                                  **Civil Action No. 2:09CV91**
                                           **(Judge Maxwell)**

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,
      **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen.P 86.02; Standing Order 6.

### I. Procedural History

Cindy L. Marfield ("Plaintiff") filed applications for DIB and SSI on August 26, 2005, alleging disability beginning March 24, 2005, due to mental problems, stomach problems, and depression (R. 87).[1] Both applications were denied initially and on reconsideration (R. 52, 54, 275,

---

[1]Plaintiff filed prior concurrent applications on April 2003, alleging disability since November 14, 2001 due to chronic stomach and mental problems (R. 35). Those applications were denied at the Initial and Reconsideration stages, and after hearing, by decision of Administrative law Judge Karl Alexander on March 23, 2005. Plaintiff did not request any further review of that decision, and it is considered *res judicata* through March 23, 2005 (R. 16).

282). Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") Thomas Mancuso held on May 7, 2007 (R. 303). Plaintiff, represented by counsel, was present and testified, as did Vocational Expert Dr. Andrew Beale ("VE") (R. 392). On May 22, 2007, the ALJ issued an unfavorable decision (R. 25). Plaintiff filed a Request for Review, attaching additional evidence (R. 12). On May 28, 2009, the Appeals Council denied Plaintiff's request for review (R. 6), rendering the ALJ's decision the final decision of the Commissioner.

## II. Statement of Facts

Cindy Marfield ("Plaintiff") was born on March 20, 1959, and was 45 years old on her alleged onset date and 48 at the time of the ALJ's decision (R. 25, 84). She completed high school and one year of college (R. 91). She has past work experience as an "automated nap seamer" in a factory and as a material handler in a warehouse (R. 88). She stopped working in November 2002, when, as she stated, she was "terminated for being off work for a long period of time" (R. 88).

On January 25, 2005, Plaintiff presented to James Gainer, M.D., who noted she had moved to West Virginia in June 2004 (R. 224). She had lived in Texas and had just gotten her medical card before she moved. Prior to Texas, she had lived in Tennessee. She said she used to take Zoloft and Seroquel, and that she had had depression for the past three to four years. Plaintiff stated she had not worked in that time due to depression and anxiety, but was not taking medications due to financial hardship. She complained of poor concentration and apathy. She also complained of stomach discomfort for years with occasional radiation into her chest. She said she had lost 30 pounds in the last six months without trying. She also reported having been the victim of a domestic assault on January 18, 2005, at which time she sustained a foot injury as well as broken ribs. Dr. Gainer performed a physical examination fo the State Department of Health and Human Resources.

Plaintiff was 5'5" and weighed 114 pounds. Dr. Gainer noted she had a mildly flat affect.

Dr. Gainer diagnosed depression, gastroesophageal reflux disease ("GERD"), weight loss, and status post assault with multiple injuries. He stated she would be unable to work full time at her customary occupation or any other full time work, but put a question mark ("?") after that statement due to it's being "per patient's report." He made a request for old medical records. He opined Plaintiff would be unable to work full time for one month, and restarted her on Zoloft.

On September 17, 2005, Plaintiff presented to Appalachian Community Health Center (ACHC) for a Mental Functional Assessment (R. 247). Plaintiff reported experiencing depression for over six years. She reported her husband was mentally and sexually abusive. She was not depressed every day, but had crying episodes and rated her depression as moderate. Her home life was stressful, including her step-son, who lived at home, being very disrespectful toward her. She felt unworthy, but church and faith did help with this. She did not want to be around other people. She avoided her husband when they argued. She had mood swings with an increase in anger and irritability. She had some verbal outbursts. She became very distracted and had problems concentrating and focusing. She had loss of interest in daily activities and worried about her finances because she had no money of her own. Her only source of income was through her husband's SSI. She had anxiety and panic attacks during which she felt she was having a heart attack and was unable to breathe, one to five times a week. She was not intimate with her husband, who made sex "ugly and nasty" and was very rough and mean.

Plaintiff said she had been married for one year, and past relationships were also abusive (R. 248). She had been unemployed for four years. She liked her job but quit due to depression. She had been off for long periods of time. She attended church regularly. She was hospitalized for

3

depression in Tennessee five years earlier. She denied all substance abuse.

Plaintiff reported not having any prescribed medications at the time, but being provided zoloft by a friend that she took from time to time (R. 248). She reported no medical problems, but said she didn't feel well. She did have hearing loss. She had an appointment with Dr. Gainer for medical problems.

Upon Mental Status Exam it was noted Plaintiff was late for her appointment, but dressed appropriately and neatly, although her hair was very disheveled (R. 248). She had good eye contact. She reported fluctuating sleep and energy and good appetite. She had suicidal thoughts with a plan, but did not feel she would go through with it. She denied hallucinations, delusion or paranoia, but reported strange dreams and disturbing nightmares. Her affect was appropriate, her mood good, her memory diminished , and she was well oriented.

The intake evaluator noted Plaintiff requested a female counselor due to her problem discussing certain problems such as sexual abuse (R. 249). The provisional diagnosis was major depressive disorder, recurrent, moderate; panic disorder without agoraphobia; and marital problems. She had a GAF of 60.

On September 19, 2005, Plaintiff presented to Dr. Gainer for complaints of sore throat, back pain between her shoulder blades, which "comes and goes," GERD, and lack of menstrual period with pain (R. 222). Upon medical examination, Plaintiff had tenderness in the epigastric area. Dr. Gainer diagnosed an upper respiratory infection, dysmenorrhea, and GERD.

On October 3, 2005, psychologist Thomas Stein, Ph.D. completed a Mental Status Examination of Plaintiff for the State Disability Determination Service ("DDS") (R. 159). Plaintiff was casually dressed and neat and clean. Her husband drove. Her posture and gait were both

4

adequate with no involuntary movements noted. She used no ambulatory aids.

Plaintiff's stated chief complaint was mood swings. She reported being irritable, depressed, and hated her surroundings at some times, and then at other times, was okay and could get along with people. She was angry a lot and sad and depressed a lot. She told the psychologist her stomach hurt bad and affected her breathing.

Plaintiff reported sleep disturbance with difficulty falling asleep as well as early wakening (R. 160). She denied crying episodes, but said her energy level was poor. She described her mood as "not in a good mood." She admitted to suicidal ideations in the past, but none recently, and denied previous attempts or current plan. She denied phobias. She reported two panic attacks per week and current nightmares.

Plaintiff reported her heaviest alcohol usage was in her early 30's when she would have three mixed drinks over the course of a weekend (R. 160). She denied drinking in the past 12 months and denied ever experimenting with any illegal drugs. She had been treated for depression and anxiety "off and on" from 1999 to the present. She had two previous inpatient psychiatric hospitalizations, both for anxiety, and both in Tennessee, at 26 and 43 years of age. "She received outpatient treatment in Tennessee from psychiatrist Angela Wood, M.D., whom she saw on a once per month basis for medication management only." She was not presently receiving any mental health services.

Upon Mental Status Examination, Plaintiff was cooperative and polite, maintained good eye contact, and evidenced adequate length and depth of verbal responses ( R. 161). She had no sense of humor, but there was a little spontaneous generation of conversation. She was introverted with fair conversation skills. Her speech was relevant and coherent, although with a slight disarticulation. She spoke at a normal pace and was well oriented. Her mood was depressed and her affect subdued.

5

There were no thought processing disturbances, delusions, preoccupations, obsessions or phobias, hallucinations or illusions. Insight was deemed adequate and judgment average. Her immediate memory was mildly deficient, recent memory normal, and remote memory mildly deficient. Concentration was average. Objectively, she displayed depressed and irritable moods, but good memory and concentration and average judgment.

Plaintiff described her daily activities as arising at 10:30 a.m., taking care of her own personal hygiene, smoking, drinking water, watching television, fixing and eating oatmeal, letting the dog out, straightening up the house, doing laundry, then taking a shower, finishing straightening the house, fixing supper, visiting with her spouse, and eating dinner with spouse and stepson. She would then clean the kitchen and watch more television and go to bed by 11:00. She occasionally cooked and cleaned, but regularly washed dishes and did laundry. She always had help with grocery shopping and did not run errands and did not drive. She occasionally fished. She collected lighthouses and read. Regarding Social Functioning, Dr. Stein found she was mildly deficient. Concentration, persistence and pace were normal.

Dr. Stein diagnosed Bipolar Disorder, type 2 (depressed,) and posttraumatic stress disorder, chronic, with mild symptoms.

On October 5, 2005, Plaintiff underwent a Consultative Examination for the State DDS, performed by Susan L. Garner, M.D. (R. 164). Plaintiff's chief complaint was chronic stomach problems. She was being treated for GERD with ranitidine, which she had only started a few weeks ago. It did not always help. Plaintiff stated that when she initially started having this problem, in 2004, she lost approximately 20-30 pounds, but was currently gaining it back because her appetite had increased. Dr. Garner reported Plaintiff also had depression and conductive hearing loss. Dr.

Garner had no medical records to review.

Upon physical examination, Plaintiff used no ambulatory aids, and her gait appeared normal (R. 165). She had no difficulty arising from a seated position or climbing up or down from the examination table. She appeared comfortable. She could only hear well when spoken to on the right, but could follow instructions without difficulty. She was 5'5 and 121 pounds. Her abdomen was soft but slightly distended with hyperactive bowel sounds. There was no tenderness, rebound or guarding noted. Her spine had normal curvature with no evidence of spasm or tenderness. She could stand on one leg at a time and straight leg raising was normal both supine and sitting.

Dr. Garner's only impression was chronic abdominal pain, suggestive of GERD (R. 167).

On October 21, 2005, Plaintiff presented to Dr. Gainer for a DHHR physical examination (R. 220). Physically, he found everything normal with the exception of mild epigastric tenderness. He noted Plaintiff had a flat affect. Plaintiff also complained of pain between her shoulder blades, and pain in her legs worse with standing for any periods of time. He diagnosed depression, chronic pain, GERD, and osteoarthritis. Dr. Gainer completed a form for the State DHHR, noting Plaintiff had a diagnosis of depression and anxiety and PTSD, with stable prognosis (R. 221). He again wrote that she would be unable to work, but with a question mark ("?") stating this was based on Plaintiff's report. He did not state any duration for her inability to work, stating that she was to try treatment of her depression and anxiety at the Appalachian Community Health Center. He prescribed Ranitidine for her GERD and Darvocet for pain.

On December 6, 2005, State agency reviewer Bob Marinelli completed a Psychiatric Review Technique ("PRT"), finding that Plaintiff had an affective disorder that was non-severe (R. 171). He found she had only mild restriction of activities of daily living, mild difficulties in maintaining

social functioning, and mild difficulties maintaining concentration, persistence or pace, but had had one or two episodes of decompensation, each of extended duration (R. 181).

An unsigned Physical Residual Functional Capacity Assessment dated December 6, 2005, based only on a diagnosis of hearing loss, found Plaintiff would have no physical limitations aside from communicative problems due to her hearing loss. On February 28, 2006, State reviewing physician Fulvio Franyutti affirmed this RFC (R. 198).

On December 14, 2005, Plaintiff underwent a Comprehensive Psychiatric Diagnostic Interview Examination at ACHC, performed by Licensed Psychiatrist Walter Byrd, M.D. (R. 242). Her chief complaint was that she thought she was "getting moody again." She reported struggling with depression for ten years, and being in treatment for six years. She was most recently treated with a combination of Seroquel and Zoloft while living in Tennessee. She moved to Houston in 2004 to live with her daughter at which time she discontinued the medications. She met her current husband through the internet while she lived there. After dating briefly they returned to West Virginia and married in 2004. She reported that over the last several months she has had increasing agitation, irritability, anxiety, panic attacks, mood swings and prominent outbursts of anger, along with marital problems. Her husband was being treated for Bipolar disorder.

Plaintiff denied drug or alcohol use (R. 242). She did not sleep well and reported racing thoughts, feeling "wired" and tossing and turning most of the night, with fatigue the next day. She denied hallucinations or delusional thinking, but reported significant distractability. She felt depressed some of the time, but it seemed cyclical. There were days when she felt pretty good, but with an underlying thread of irritability even on more positive days. She and her husband argued extensively.

Plaintiff reported she had been hospitalized in the 80's for a panic attack and was treated for anxiety with no psychiatric follow up. In the late 90's she began treatment with Celexa and Seroquel which were generally effective. She eventually discontinued the medications, feeling she was recovered and no longer needed them. In 2001, however, she was experiencing intense mood lability, racing thoughts, insomnia, anxiety and agitation to a point that her family took her to the ER and she was subsequently hospitalized psychiatrically. After discharge she was followed by psychiatrists for four years, maintained primarily with Seroquel and Zoloft. She had a trial of Risperdal which she felt was most effective in reducing her anxiety, calming her emotional mood swings and distractability. She used Ativan briefly and sparingly during this time. She had not been on psychiatric medications since moving to Houston in 2004. She had considered starting Effexor since starting with Dr. Gainer.

Plaintiff denied a history of drug or alcohol use. There was no report of any major medical problems, with the exception of hearing loss.

Upon Mental Status Examination Plaintiff was neatly dressed, articulate, made good eye contact, and was somewhat emotionally labile (R. 244). At times she was almost tearful but stated she was able to cover up sadness with good humor. She showed some distractability and slight tangentiality of thought. She denied suicidal urges or impulses, but said her sleep was poor and her appetite fluctuated. Her energy was low when she did not sleep. Her mood was moderately depressed and her affect somewhat labile. Her intelligence appeared generally good. Anxiety level appeared moderately severe. She was not disorganized in thought patterns and had not been having panic attacks. There was no history of social phobia or obsessive compulsive disorder (R. 245).

Dr. Byrd opined Plaintiff's symptoms suggested a mixed Bipolar state with prior beneficial

9

effects from a combination of low dose antidepressant and mood stabilizer. He diagnosed Bipolar disorder, Type II, Depressed phase, with a GAF of 55 (R. 245). He prescribed Celexa and Risperdal for regular use, with a low dose of Lorazepam as needed for outbursts of anger, irritability or fearfulness.

Plaintiff presented to Dr. Gainer on January 18, 2006, for complaints of sinus drainage with cough (R. 219). He diagnosed an upper respiratory infection with sinusitis, sore throat, and GERD.

On January 24, 2006, Plaintiff presented to the ER for pain in her ears and nose (R. 193). She was diagnosed with an upper respiratory infection. It was noted she was taking Risperdal and Ativan.

On January 31, 2006, Plaintiff presented to psychiatrist Dilip Chandran, M.D. for pharmacological management of her mental impairments (R. 240). It was noted that Plaintiff was taking the Lorazepam as needed, up to four times a week, and the Risperdal nightly, but had not taken the Celexa regularly. She noted some irritability, moodiness, anxiety and frustration, but had otherwise "done fairly well without any other worsening psychiatric symptoms."

Objectively, Dr. Chandran found Plaintiff pleasant and cooperative without agitation or combativeness (R. 240). She was alert and oriented. Her mood was slightly anxious and dysthymic and her affect was appropriately frustrated. Dr. Chandran diagnosed Bipolar Type II Disorder and Generalized Anxiety Disorder with Panic Attacks (R. 240). He increased the dosage of her Risperdal.

On April 3, 2006, Plaintiff presented to the ER for an earache with sinus pain and headache (R. 200). It was noted she was taking Risperdal and Lorazepam.

On April 18, 2006, Plaintiff saw Dr. Chandran for pharmaceutical management of her bipolar disorder and general anxiety disorder (R. 239). She wanted to increase the dosage of Risperdal but

did feel much better even on the present dosage. It was noted she had missed her March appointment. Objectively, she had stable mood, no panic attacks, and no depressive features or symptoms. She continued to be diagnosed with Bipolar Type II disorder and General Anxiety disorder.

On June 16, 2006, Plaintiff presented to the ER with complaints of toothache (R. 204).

On July 18, 2006, Plaintiff saw Dr. Chandran for pharmacological management of her bipolar disorder and generalized anxiety disorder with panic attacks (R. 237). Plaintiff reported her marital stressors had improved. She had been presenting regularly for individual counseling. She reported worsening anxiety and panic symptoms and ongoing mood swings and depression. She still had difficulties falling asleep and with racing thoughts. Plaintiff requested Xanax and Valium, but the doctor suggested she not change to "these longer-acting benzodiazepines."

Objectively, Plaintiff was pleasant and cooperative and listened appropriately. She was slightly anxious and fidgety and distractible. She remained alert and oriented and her affect was appropriate. Dr. Chandran continued to diagnose Bipolar Type II Disorder and Generalized Anxiety disorder with Panic Attacks. He increased her Risperdal and Ativan, but resisted changing her medications, stating it was important to avoid any type of Xanax/Klonopin/Valium.

On July 19, 2006, Plaintiff presented to Dr. Gainer for a 6-month followup (R. 219). Plaintiff said she felt horrible with aching all over in her muscles, joints, back and teeth all the time. Medication did not help much. She had been to the ER for her teeth, but the medication upset her stomach. Plaintiff's examination was normal with the exception that she had a flat affect. Dr. Gainer diagnosed osteoarthritis with a questionable component of fibromyalgia, GERD, and depression.

On August 22, 2006, Plaintiff presented to Dr. Chandran for pharmacological management of her bipolar disorder and anxiety disorder (R. 236). Her mood was stable with no anxiety attacks or depressive features or symptoms. She was continued on her medications.

On August 22, 2006, Plaintiff presented to the ER with complaints of abdominal pain for three weeks with vomiting, exacerbated by food (R. 209). Upon examination her stomach was bloated. She was diagnosed with acute abdominal pain and GERD.

On August 28, 2006, Plaintiff presented to Dr. Gainer for a follow-up of her ER visit for GERD (R. 218). Upon examination, she had tenderness of the epigastric area. Dr. Gainer diagnosed GERD, depression, and abdominal pain. He switched her to Nexium and referred her to Appalachian Mental Health for her depression.

On September 12, 2006, Plaintiff presented to Dr. Chandran for pharmacological management of her bipolar and anxiety disorders (R. 235). Objectively her mood was stable with no anxiety attacks or depressive features or symptoms. She was continued on her medications.

On January 19, 2007, Plaintiff presented to Dr. Gainer for followup (R. 267). She complained of aching all over, no "get up and go," and head and chest congestion for the past couple of weeks. She was off Zoloft, but on Ativan and Risperadol per ACHC, and was taking no pain meds or NSAIDS presently. She was diagnosed with pain, possibly due to osteoarthritis versus fibromyalgia, for which she was prescribed Elavil and Darvocet; Insomnia; GERD; and depression, which was followed at ACHC.

On March 7, 2007, Plaintiff presented to Dr. Gainer for a physical examination for the State DHHR (R. 260). Plaintiff stated she was disabled due to "mental stability." Physical exam was normal with the exception of her abdomen which had mild epigastric tenderness. It was noted she

was on medications for psychiatric issues. Plaintiff also described back pain. Dr. Gainer's primary diagnosis was depression/anxiety and minor diagnosis was GERD, osteoarthritis and hearing loss. Where asked if Plaintiff could work full time the doctor wrote "Pt. Reports no." The doctor noted that work situations that should be avoided were stress and moderately heavy physical activity. The duration of her inability to work full time was listed as "'Permanent' per pt." Dr. Gainer opined Plaintiff should be referred for vocational rehabilitation. He summarized his conclusions as: 1) Depression and anxiety on Lorazepam and Risperadol per patient (ACHC); GERD, under good control with medications, mild osteoarthritis, and hearing loss. He answered only with a question mark the questions of length of time her disability was expected to last and employment limitations (R. 259).

At the Administrative Hearing held on May 7, 2007, Plaintiff testified she was seeing a mental health counselor once a week, a nurse practitioner for prescriptions, and had not seen the actual psychiatrist since about September 2006 (R. 316). Plaintiff's counsel noted that ACHC had not sent records from the past year and asked that the record remain open for him to have those records submitted. The ALJ instead stated he would close the record and reopen it when he received the records from ACHC (R. 324). No records were submitted before the ALJ entered his Decision 15 days later, on May 22, 2007 (R. 25).

**Evidence submitted to Appeals Council**

Prior to the Appeals Council decision, Plaintiff submitted the following:

Plaintiff cancelled her appointments with Dr. Chandran on March 5 and 29, 2007 (R. 299-300).

On April 3, 2007, Plaintiff presented to Dr. Chandran for pharmacological management of her bipolar and anxiety disorders (R. 298). Objectively Plaintiff showed a stable mood, no anxiety attacks or depressive features, no psychotic features, no hallucinations, and no suicidal or homicidal tendencies. She was diagnosed with Bipolar Type II Disorder and General Anxiety Disorder and continued on Risperdal and Lorazepam.

On May 8, 2007, Plaintiff presented to Dr. Chandran for pharmacological management of her bipolar and anxiety disorders (R. 297). Objectively, she exhibited stable mood, no anxiety attacks or depressive features, no psychotic features, and no hallucinations or suicidal or homicidal ideations. She continued to be diagnosed with Bipolar Type II disorder and General Anxiety Disorder and was continued on Risperdal and Lorazepam.

On May 9, 2007, Licensed Psychologist Hallie A. McLeod, MA, LPC wrote that Plaintiff had begun Individual Psychotherapy in October 2005 (R. 296). It was recommended she attend one 60-minute session per week. Ms. McLeod reported that Plaintiff attended 33 out of 56 scheduled therapy sessions over the last 18 months, focusing on reducing symptoms of depression. Ms. McLeod noted this was challenging because Plaintiff's ailments interfered with her treatment, in that she often canceled due to pain, lack of sleep, or illness. This in turn increased her symptoms of depression, such as lack of motivation, poor focus, poor concentration, hopelessness and sadness. After missing sessions, Plaintiff's state of mine would decompensate to baseline levels of depression, presenting as very sad mood, lethargy, fatigue, poor concentration and general lack of zest for life. Ms McLeod stated this pattern occurred every month, with Plaintiff keeping her appointments three weeks in a row and showing some reduction in symptoms, but then canceling the next one to three appointments and decompensating. Ms. McLeod opined that due to this cycle

of missed appointments due to illness, followed by return to baseline depression, it was unlikely that Plaintiff would achieve full remission of symptoms.

On July 3, 2007, Plaintiff presented to Dr. Chandran for pharmacological management of her bipolar and anxiety disorders and nicotine dependence (R. 295). Dr. Chandran noted that Plaintiff had been seeing Licensed Psychologist Hallie McLeod for therapy. She had, however, canceled the last three appointments. She had difficulties with irritability, mood swings, anger outbursts, anxiety and frustration. Objectively, Plaintiff was pleasant and cooperative. Her mood was anxious and dysthymic and her affect was appropriately frustrated. She was mildly fidgety and distractible. She remained alert and oriented. She was diagnosed with Bipolar Type II Disorder, Generalized Anxiety Disorder with Panic Attacks, and Nicotine Dependence. Dr. Chandran increased Plaintiff's Risperdal, and suggested Melatonin for her insomnia.

On October 3, 2007, Plaintiff presented to Dr. Chandran for pharmacological management of her Bipolar and Anxiety disorders and insomnia (R. 294). Plaintiff reported Dr. Gainer had started her on Temazepam for insomnia. She was also taking Ativan. Objectively, Plaintiff was pleasant and cooperative. Her mood was slightly anxious and her affect appropriate and she was mildly fidgety and distractible. She was diagnosed with Bipolar Type II Disorder, Generalized Anxiety Disorder with Panic Attacks, Insomnia, and Nicotine Dependence.

On December 5, 2007, Plaintiff was seen by Dr. Chandran for pharmacological management of her bipolar disorder, generalized anxiety disorder and insomnia (R. 292). She said she did well with Temazepam but occasionally needed two capsules nightly. She also had some daytime anxiety/worrying and racing thoughts. She resumed Risperdal. Dr. Chandran reported Plaintiff was undergoing regular counseling at ACHC. Objectively, Plaintiff was pleasant and cooperative. Her

mood was slightly anxious and affect was appropriate. She was mildly distractible and fidgety-inattentive. She remained alert and oriented. Dr. Chandran continued to diagnose Plaintiff with Bipolar Type II Disorder, Generalized Anxiety Disorder with Panic Attacks, and Insomnia. He continued her on Risperdal and increased her Ativan.

The Appeals Council made the above evidence part of the record, and stated it considered the additional evidence, but found that information did not provide a basis for changing the ALJ's decision (R. 7).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, ALJ Mancuso made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2007.

2.  The claimant has not engaged in substantial gainful activity since March 24, 2005, the alleged onset date  (20 CFR §§ 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: gastroesophageal reflux disease and osteoarthritis with associated pain, and a profound hearing loss in the right ear ( 20 CFR §§ 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the exertional demands of light work, i.e., sit up to six hours in an eight-hour workday, stand and walk up to six hours in an eight-hour workday, and lift weights of ten pounds frequently and twenty pounds occasionally, due to her gastroesophageal reflux disease and osteoarthritis with chronic pain. Nonexertionally, despite her chronic pain that is of sufficient severity to be noticeable at all times and a profound right ear hearing loss, she is able to

attend to and carry out assigned duties.

6.  The claimant is capable of performing past relevant work as a machine operator. This work does not require the performance of work-related activities precluded by her residual functional capacity (20 CFR §§ 404.1565 and 416.965).

7.  The claimant has not been under a "disability," as defined in the Social Security Act, from March 24, 2005 through the date of this decision (20 CFR §§ 404.1520(f) and 416.920(f)).

(R. 16-25).


# IV. Contentions

A.  Plaintiff contends:

1.  The Commissioner erred as a matter of law by discounting the plaintiff's credibility without providing specific reasons supported by the evidence in the case record.

2.  The Commissioner erred as a matter of law by finding that the plaintiff is capable of performing past relevant work as a machine operator.

3.  The Commissioner erred as a matter of law by failing to consider the new evidence submitted with the appeal regarding the claimant's mental impairments.


B.  The Commissioner contends:

1.  The ALJ properly determined that Plaintiff overestimated the limiting effects of her impairments.

2.  The ALJ correctly determined that Plaintiff could perform her past relevant work as a machine operator.

3.  The Commissioner properly declined to consider the extra record evidence submitted by Plaintiff.

## V. Discussion
### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971)(citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984)(quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

The undersigned United States Magistrate Judge finds substantial evidence does not support the ALJ's decision in this matter, but for somewhat different reasons than addressed by the parties.

### B. Social Security Acquiescence Ruling 00-1(4).

Pursuant to Social Security Acquiescence Ruling ("AR") 00-1(4), when adjudicating a subsequent disability claim arising under the same or a different title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence and give it appropriate weight in light of all relevant facts and circumstances. (Emphasis added). Plaintiff argues that in finding that she could perform

her prior work as a machine operator, ALJ Mancuso did not accord the proper weight to ALJ Alexander's prior finding that she could not perform that work. ALJ Mancuso gave ALJ Alexander's finding only limited weight. Defendant contends that, "contrary to Plaintiff's arguments, the ALJ did not err in giving little weight to the prior findings of an ALJ who previously heard this matter . . . ." The undersigned addresses this issue first, and in regard to the subsequent ALJ's entire decision.

Plaintiff filed an application for DIB on May 8, 2003, alleging disability beginning on November 14, 2001, due to chronic stomach and mental problems, including depression (R. 35). Following denials at the initial and reconsideration levels, Administrative Law Judge Karl Alexander held a hearing on January 27, 2005. ALJ Alexander entered a Decision on March 23, 2005, concluding that Plaintiff had not been under a disability as defined in the Social Security Act at any time since her alleged onset date. This finding applied to Plaintiff's condition through March 23, 2005, the date of the decision. See Albright v. Commissioner, 174 F.3d 473 (4th Cir. 1999). Albright, like Plaintiff here, did not appeal the decision, instead filing a subsequent application. In her current application, Plaintiff alleged an onset date of March 24, 2005, the day after the previous decision. As in Albright's case, SSA considered Plaintiff's subsequent application to be a new claim, relating to her condition subsequent to the prior adjudication, _i.e.,_ from March 24, 2007 onward. Id.[2]

---

[2]To the extent that a second application seeks to relitigate a time period for which the claimant was previously found ineligible for benefits, the customary principles of preclusion apply with full force. Indeed in the case at bar, Albright's second application alleged the onset of disability as being March 31, 1990, the same as in his first application. Accordingly, the second ALJ dismissed Albright's claims insofar as they related to the period from March 31, 1990, through May 28, 1992, the date of the final decision in the first proceeding. The ALJ's dismissal was entirely proper, and it is not contested on appeal. Id.

Therefore Plaintiff's alleging a new onset date does not necessarily mean she alleges disability only since that date, but merely acknowledges the reality that the previously-decided period will not be reconsidered.

Before Albright, the Fourth Circuit had decided Lively v. Secretary, 820 F.2d 1391 (4th Cir. 1987). In that case, the claimant, Lively, was found not disabled because he had the residual functional capacity for light work. See AR 00-1(4). Two weeks after that decision, Lively turned age 55, and would, under Rule 202.02 of the medical-vocational guidelines, be considered disabled if limited to light work. He filed a subsequent application and was again found not disabled, based on another ALJ finding he had the capacity for work at any exertional level. The Fourth Circuit reversed, finding it "inconceivable" that Lively's condition had improved so much in two weeks as to enable him to perform medium work. The Court held:

> Principles of finality and fundamental fairness . . . indicate that . . . [SSA] must shoulder the burden of demonstrating that the claimant's condition had improved sufficiently to indicate that the claimant was capable of performing medium work . . . [E]vidence, not considered in the earlier proceeding, would be needed as an independent basis to sustain a finding contrary to the final earlier finding.

Id.

In Albright, the Fourth Circuit explained its holding in Lively as follows:

> Rather than signaling a sea change in the law of preclusion, the result in *Lively* is instead best understood as a practical illustration of the substantial evidence rule. In other words, we determined that the finding of a qualified and disinterested tribunal that Lively was capable of performing only light work as of a certain date was such an important and probative fact as to render the subsequent finding to the contrary unsupported by substantial evidence. To have held otherwise would have thwarted the legitimate expectations of claimants – and, indeed, society at large – that final agency adjudications should carry considerable weight. Even more importantly, judicial ratification of the SSA's "bait-and-switch" approach to resolving Lively's claim would have produced a result reasonably perceived as unjust and fundamentally unfair.

promulgated AR 00-1(4), which first states the Commissioner's general position:

> In a subsequent disability claim, SSA considers the issue of disability with respect to a period of time that was not adjudicated in the final determination or decision on the prior claim to be a new issue that requires an independent evaluation from that made in the prior adjudication. Thus, when adjudicating a subsequent disability claim involving an unadjudicated period, SSA considers the facts and issues de novo in determining disability with respect to the unadjudicated period. SSA does not consider prior findings made in the final determination or decision on the period claim as evidence in determining disability with respect to the unadjudicated period involved in the subsequent claim.

However the Ruling goes on to provide:

> SSA interprets the decision by the United States Court of Appeals of the Fourth Circuit in *Albright* to hold that where a final decision of SSA after a hearing on a prior disability claim contains a finding required at a step in the sequential evaluation process for determining disability, SSA must consider such finding as evidence and give it appropriate weight in light of all relevant facts and circumstances when adjudicating a subsequent disability claim involving an unadjudicated period. This Ruling applies only to disability decisions in cases involving claimants who reside in Maryland, North Carolina, South Carolina, Virginia or West Virginia at the time of the determination or decision on the subsequent claim at the initial, reconsideration, ALJ hearing or Appeals Council level. It applies only to a finding of a claimant's residual functional capacity or other finding required at a step in the sequential evaluation process for determining disability provided under 20 CFR 404.1520, 416.920 or 416.924, as appropriate, which was made in a final decision by an ALJ or the Appeals Council on a prior disability claim.

> When adjudicating a subsequent disability claim arising under the same or a different title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence and give it appropriate weight in light of all relevant facts and circumstances. In determining the weight to be given such a prior finding, an adjudicator will consider such factors as: (1) whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period being adjudicated in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim.

Where the prior finding was about a fact which is subject to change with the passage of time, such as a claimant's residual functional capacity, or that a claimant does or does not have an impairment(s) which is severe, the likelihood that such fact has changed generally increases as the interval of time between the previously adjudicated period and the period being adjudicated increases. An adjudicator should give greater weigh to such prior findings when the previously adjudicated period is close in time to the period being adjudicated in the subsequent claim, e.g., a few weeks as in *Lively*. An adjudicator should generally should give less weight to such a prior finding as the proximity of the period previously adjudicated to the period being adjudicated on the subsequent claim becomes more remote, e.g., where the relevant time period exceeds three years as in *Albright*. In determining the weight to be given such a prior finding, an adjudicator must consider all relevant facts and circumstances on a case-by-case basis.

In the case at bar Administrative Law Judge Mancuso correctly quotes the Ruling. At step one of the sequential evaluation, the previous ALJ (Alexander) had found that Plaintiff had not engaged in substantial gainful activity at any time since November 14, 2001. In the subsequent claim, ALJ Mancuso found:

The previous decision of Administrative Law Judge Alexander concluded that Ms. Marfield had not engaged in substantial gainful activity since her alleged onset of disability . . . Based on current evidence that the claimant has not had any earnings since 2002 . . the undersigned gave that finding great weight in concluding that she has not engaged in substantial gainful activity since her current alleged onset of disability of March 24, 2005.

At step two of the sequential evaluation, ALJ Alexander previously found that Plaintiff had the following impairments, which were severe either individually or in combination: mild thoracolumbar scoliosis, with reported history of low back sprain; history of tendinitis of the feet; gastroesophageal reflux disease; chronic sinusitis/bronchitis; chronic obstructive pulmonary disease; mild obstructive sleep apnea; mild obesity; delusional disorder; and major depressive disorder (R. 46). Notably, Plaintiff's subsequent application alleged an onset date only one day after ALJ Alexander's decision, meaning under AR 00-1(4) that that decision as to severe impairments should

have been given greater weight. ALJ Mancuso, however, found Plaintiff's only severe impairments were right ear hearing loss, gastroesophageal reflux disease that produces abdominal pain, and osteoarthritis with associated musculoskeletal pain (R. 19). Most notably, he found she had no severe mental impairment at all. Regarding the weight he accorded ALJ Alexander's previous decision, ALJ Mancuso stated as follows:

> The decision of Administrative Law Judge Alexander concluded that the claimant had "severe" impairments of gastroesophageal reflux disease, mild scoliosis, sinusitis, chronic obstructive pulmonary disease, sleep apnea, obesity, a delusional disorder and a major depressive disorder. After consideration of the submitted medical evidence since the claimant's current alleged onset of disability, that finding has been given limited weight.

ALJ Mancuso does not discuss the proximity in time between the prior decision and new alleged onset date (one day). He does not discuss the likelihood that Plaintiff's severe impairments would change over one day. He does state he considered evidence submitted since her new alleged onset date, which could be considered "the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim." The undersigned nevertheless finds ALJ Mancuso has not complied with the Ruling, and therefore, as in Albright, finds substantial evidence does not support his determination at step two regarding Plaintiff's severe impairments. The most obvious example is that ALJ Alexander found that Plaintiff had severe mental impairments as of March 23, 2005, and ALJ Mancuso found she had no severe mental impairment at all. Further, the undersigned finds ALJ Mancuso's explanation regarding new evidence is lacking in supportability. ALJ Mancuso states, for instance, "the first report of actual psychiatric symptoms and evaluation subsequent to Ms. Marfield's alleged onset of disability dates from September 17, 2005" (R. 19). Treating physician

Gainer, however, diagnosed Plaintiff with depression and prescribed Zoloft in January 2005, three months prior to her new alleged onset date.

The undersigned United States Magistrate Judge similarly finds ALJ Mancuso did not comply with AR 00-1(4) in his evaluation of Plaintiff's residual functional capacity ("RFC"). As of March 23, 2005, ALJ Alexander found Plaintiff had the residual functional capacity to perform work that required no more than a light level of physical exertion; afforded the option to either sit or stand; required no climbing of ladders, ropes or scaffolds, but may require other postural activities to be performed at least occasionally; entailed no concentrated exposure to temperature extremes or environmental pollutants; entailed no production line type of pace or independent decision-making responsibilities; and consisted of routine, repetitive tasks that involve no more than occasional interaction with other persons (R. 46). ALJ Mancuso found that, starting one day later, Plaintiff had the RFC to perform the full range of light work with no further exertional or non-exertional restrictions (R. 21). ALJ Mancuso explains the difference in his RFC finding as follows:

> The undersigned gave limited weight to the previous finding of Administrative Law Judge Alexander that the claimant had a residual functional capacity for a reduced range of light work due to postural, environmental and psychiatric limitations due to the passage of time, the objective findings of the current medical evidence, and the claimant's less than credible testimony.

Most significantly, there is clearly no "passage of time" between March 23, 2005, and March 24, 2005. Further, the undersigned finds this explanation, especially as regards the non-exertional mental limitations, does not comport with the Ruling. Therefore, substantial evidence does not support ALJ Mancuso's giving little weight to ALJ Alexander's findings and therefore also does not support his RFC finding.

Most problematic, as Plaintiff argues, is ALJ Mancuso's consideration of ALJ Alexander's

finding regarding Plaintiff's inability ability to perform any of her past relevant work. ALJ Alexander found that Plaintiff's former jobs "all entailed a level of physical exertion, complexity or interpersonal demand that exceeds her residual functional capacity as prescribed for the period at issue" (R. 44). ALJ Mancuso subsequently found that Plaintiff could perform her past relevant work as a machine operator (R. 23). He explained the difference in his finding as follows:

> The previous decision of Administrative Law Judge Alexander found that the claimant could not perform her past relevant work. That finding was given limited weight because it failed to identify the exertional and nonexertional demands of the claimant's past relevant work.

(R. 23). The undersigned finds ALJ Mancuso did not comply with the Ruling in this regard. The Ruling requires the prior finding to be considered as evidence. It also specifically requires the subsequent ALJ to consider "such factors as": 1) whether the fact on which the prior finding was based is subject to change with the passage of time; 2) the likelihood of such a change; and 3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding. Here, ALJ Mancuso is not opining that Plaintiff can now work at her past job because her condition has improved or even that the job itself has changed over time. Instead it appears to the undersigned United States Magistrate Judge that ALJ Mancuso simply disagrees with ALJ Alexander's finding and disapproves of the manner in which he made that finding. As Defendant himself argues: "The ALJ correctly gave little wight to the previous ALJ's step four findings because he failed to delineate the exertional and non-exertional demands of Plaintiff's past work as a machine operator . . . . Thus, he did not know that this occupation qualified as sedentary work . . . . But for the prior ALJ's failure to identify the exertional and non-exertional demands of Plaintiff's job as a machine operator, he too would likely have found that she could

perform this occupation. Therefore, the ALJ in this matter correctly gave the previous ALJ's step four finding little weight." (Defendant's brief at 12-13). This statement is pure speculation. The Court has no evidence before it regarding Plaintiff's limitations before her new alleged onset date, except for ALJ Alexander's findings, which themselves are to be considered as evidence. ALJ Alexander found Plaintiff was not only limited exertionally, but also, due to her mental impairments, was limited to work which entailed to production line type of pace, independent decision-making, consisting of routine, repetitive tasks that entail no more than occasional interaction with other persons.

The undersigned therefore finds substantial evidence does not support ALJ Mancuso's according limited weight to ALJ Alexander's finding or his conclusion that Plaintiff had the RFC to perform her past relevant work.

Based on all of the above, the undersigned United States Magistrate finds ALJ Mancuso did not comply with the requirements of the Fourth Circuit or AR -00-(4) in making his decisions at Steps Two, Four, or Five of the sequential evaluation, and substantial evidence therefore does not support those findings. For that reason alone, this case must be reversed and remanded to the Commissioner for further proceedings.

### C. Appeals Council Decision

Plaintiff argues the Commissioner erred by failing to consider the new evidence submitted to the Appeals Council regarding her mental impairments. Defendant contends the Commissioner properly declined to consider the extra record evidence submitted by the plaintiff. Pursuant to 20 CFR § 404.970(b), the Appeals Council shall consider evidence submitted with a request for review if the evidence is new, material, and relates to the period on or before the dates of the ALJ's decision.

In <u>Wilkins v. Secretary</u>, 953 F.2d 93 (4th Cir. 1991), the Fourth Circuit determined that the Appeals Council will consider evidence submitted to it if the evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision. <u>Wilkins</u> further defined the terms "new" and "material" as follows: Evidence is new . . . if it is not duplicative or cumulative . . . . Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome. <u>Id.</u> at 96.

> As stated in <u>Wilkins</u>:
>
> Because the Appeals Council denied review, the decision of the ALJ became the final decision of the Secretary . . . . "Reviewing courts are restricted to the administrative record in performing their limited function of determining whether the Secretary's decision is supported by substantial evidence . . . ." The Appeals Council specifically incorporated Dr. Liu's letter of June 16, 1988 into the administrative record. Thus, we must review the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the Secretary's findings.

<u>Id.</u>

Here, as in <u>Wilkins</u>, the Appeals Council expressly incorporated the new evidence into the administrative record. Thus, the undersigned reviews the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the Secretary's findings. Upon review of the new evidence, the undersigned finds it undisputable that the material submitted to the Appeals Council relates to the period on or before the date of the ALJ's decision. The undersigned also finds that, with the exception of the two earliest records, none of the records submitted was duplicative or cumulative. Further, the undersigned finds in particular that licensed psychologist McLeod's report is material in that there is a reasonable possibility that it may have changed the outcome of the claim. ALJ Mancuso expressly stated:

> Ms. Marfield also alleges that she suffers from depression and mood swings . . . . She

> testified that she currently sees a mental health counselor once per week in addition
> to taking medications such as Risperdal . . . . Treatment notes through September 12,
> 2006 reflect that with medications and counseling, the claimant's mood was stable,
> and she had no anxiety attacks, no depressive features or symptoms, and no psychotic
> symptoms.. . . . No additional reports of the claimant's psychiatric care have been
> submitted . . . .

(R. 19-20). The report, written by a licensed psychologist, who also appears to be a treating

psychologist, contradicts the ALJ's determination that Plaintiff's mental impairments were stable

with medication and therapy. The undersigned therefore finds the report material. If it is determined

that Ms. McLeod was actually Plaintiff's treating psychologist her opinion may be entitled to great,

if not controlling weight.

Defendant argues that the evidence submitted to the Appeals Council is not "new" because

it could have been submitted to the ALJ before he made his decision. As stated in Wilkins, however:

> A claimant seeking a remand on the basis of new evidence under 42 U.S.C.A. §
> 405(g) (West 1983) must show that the evidence is new and material and must
> establish good cause for failing to present the evidence earlier. There is no
> requirement that a claimant show good cause when seeking to present new evidence
> before the Appeals Council.

Id. at footnote 3. Importantly, the undersigned notes that Plaintiff's counsel twice advised the ALJ

during the hearing that he had not received all the material from the Appalachian Community Health

Center, where Plaintiff had received most, if not all her mental health treatment. Near the end of the

Administrative Hearing, the following colloquy took place between the ALJ and counsel:

ALJ:        All right. I, as I told you earlier, Ms. Marfield, I will consider all of this and

then I will set about to prepare and issue the written decision I had mentioned

earlier and we're going to try to get that out quickly.

ATTY:        Judge, I would, I would again request the opportunity to submit these records

| | |
|---|---|
| | that appear to be missing from the Appalachian Community Health Center. |
| ALJ: | Right. Okay. Absolutely and I'll, what I'm going to do is I'm going to close the record. I'll reopen it when I receive those. You won't, you won't have any - - and that moves the case along. |
| ATTY: | That's fine with me, judge. I, I understand that - - |
| ALJ: | I will, I will reopen - - |
| ATTY: | I want to be able to document that she has gotten this consistent treatment from there from the past, you know, several months. |
| ALJ: | Yeah. That's, that's fine. |

(R. 323-324). For unknown reasons, the material from Appalachian Community Health Center was not submitted to the ALJ before he entered his decision 15 days later. The undersigned understands it is Plaintiff's burden to prove she has a disability, but, in this case in particular, counsel made the ALJ aware there were records documenting Plaintiff's mental health treatment that had not been submitted, and that he wanted to submit them before the ALJ made his decision. This was not, therefore, a case of counsel hiding a document in order to submit it after the ALJ's decision to gain an advantage.

For all the above reasons, the undersigned United States Magistrate Judge finds substantial evidence does not support the Appeals Council's rejection of Plaintiff's request for review, and further finds substantial evidence does not support the ALJ's determination that Plaintiff had no severe mental impairment.

Even if Plaintiff's mental impairments were determined to be "non-severe," the ALJ was

required to consider them combined with all her severe impairments throughout all subsequent steps of the sequential evaluation. 404.1523 provides:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process.

Here, even ALJ Mancuso determined Plaintiff did actually have mental impairments and the undersigned finds it undisputable that she had mental impairments. ALJ Mancuso found that "within a period of less than twelve months of treatment her symptoms have been stabilized with medication and counseling; even before she commenced this treatment, her symptoms were mild . . . . Despite her psychiatric symptoms, the claimant admitted in written statements and testimony that she is able to care for her personal needs, perform simple household chores, shop with her husband, cook, use a computer, play cards, and attend church." This finding concedes that Plaintiff had "psychiatric symptoms," even if arguably mild. Yet the ALJ does not even mention psychiatric symptoms or possible limitations due to those symptoms in the remaining steps of the sequential evaluation.

ALJ Mancuso further states that he "concurs" with State agency reviewing psychologist Marinelli, yet finds she had "no" restrictions of activities of daily living and no episodes of decompensation; however, Mr. Marinelli actually found Plaintiff did have restriction of activities of daily living, albeit mild, and had had one or two episodes of decompensation, each of extended duration (R. 181). The ALJ's findings in this regard are therefore inconsistent.

The undersigned therefore additionally finds that substantial evidence does not support the ALJ's findings regarding limitations resulting from Plaintiff's medically determinable mental

impairments.

### D. Credibility

Plaintiff argues that the Commissioner erred by discounting her credibility without providing specific reasons supported by the evidence in the record. Defendant contends that the ALJ properly determined that Plaintiff overestimated the limiting effects of her impairments. Because the undersigned has already found that substantial evidence does not support ALJ Mancuso's determinations at Steps Two, Four, or Five of the sequential evaluation, especially regarding Plaintiff's mental impairments, the undersigned also finds substantial evidence does not support his credibility determination.

### E. Past Relevant Work

Plaintiff argues that the Commissioner erred by finding she was capable of performing her past relevant work as a machine operator. Defendant contends the ALJ correctly determined that Plaintiff could perform her past relevant work. The undersigned has already determined that substantial evidence does not support the ALJ's determination that Plaintiff could perform her past relevant work and therefore does not further address this contention.

### VI. RECOMMENDATION

For the reasons herein stated, I find that substantial evidence does not support the Commissioner's decision denying Plaintiff's applications for SSI and DIB, and I accordingly recommend Defendant's Motion for Summary Judgment [Docket Entry 14] be **DENIED**, and Plaintiff's Motion for Summary Judgment [Docket Entry 12] be **GRANTED in part,** by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a

remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this / day of June, 2010.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE